# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 10, 2013

## STATE OF TENNESSEE v. THOMAS BOLTON

**Appeal from the Criminal Court for Shelby County**
**No. 11-06923      L.T. Lafferty, Judge**

**No. W2012-02000-CCA-R3-CD - Filed January 31, 2014**

The defendant, Thomas Bolton, appeals his Shelby County Criminal Court jury convictions of vandalism, theft of property, and violations of the Solid Waste Disposal Act, challenging the sufficiency of the convicting evidence and the propriety of certain jury instructions. We affirm the convictions and sentences but remand for correction of clerical errors in the judgments.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Jerry A. Schatz (at trial and on appeal) and Brett B. Stein (at trial), Memphis, Tennessee, for the appellant, Thomas Bolton.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kirby May and Cavett Ostner, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On November 3, 2011, the Shelby County grand jury charged the defendant with one count of vandalism of property valued at $60,000 or more, *see* T.C.A. §§ 39-14-408(a); 39-13-105(4) (2012); two counts of vandalism of property valued at more than $10,000 but less than $60,000, *see id.* § 39-14-408(a); 39-14-105(3); three counts of theft of property valued at more than $10,000 but less than $60,000, *see id.* §§ 39-14-103; 39-14-105(3); and two counts of violating the Solid Waste Disposal Act ("SWDA"), *see id.* §§ 68-211-101 to -124, arising out of the defendant's alleged dumping of construction and demolition debris on the properties of the victims over a 35-month period from 2007 until

2009. The trial court conducted a jury trial in April 2012.

At trial, Carl Everett Johnson testified that his family had owned property in the Boxtown area of Memphis since the 1930s. Mr. Johnson's father originally used the 27-acre tract for farming, and when Mr. Johnson's father died in 1959, Mr. Johnson and his brother became the owners of the property. Once Mr. Johnson's brother died in 2003, Mr. Johnson became the sole property owner. Since that time, Mr. Johnson primarily used the property, located on Sewanee Road near Beacon Road, for recreational activities. Between the years of 2003 to 2007, Mr. Johnson estimated that he visited the property four to five times per year. In approximately 2007, Mr. Johnson allowed some fellow church members to use the property to "run their dogs without weapons so that they could just see if the dogs would hunt." Mr. Johnson accompanied his friends that day, and they walked the majority of the property. At that time, Mr. Johnson noticed no damage to his property, but Mr. Johnson did notice debris just north of the northwest corner of his property. Mr. Johnson identified an aerial photograph of his property and the surrounding properties which depicted the condition of the property in 2006.

In 2010, Mr. Johnson received notice from Torian Harris with the Environmental Protection Agency ("EPA") that there were some issues with his property. When Mr. Johnson visited the property, he discovered "construction rubbage" on the property, which he defined as demolition materials and trees that were buried and covered with dirt. An aerial photograph of the area showed a large clearing on Mr. Johnson's property, near the northwest corner, which was not present in the earlier aerial photograph. Mr. Johnson testified about a ravine on his property, which, prior to 2010, was approximately 20 to 30 feet deep. In 2010, the ravine had been partially filled in.

Mr. Johnson denied knowing Ricky Whittington or the defendant, and he testified that he never gave either man permission to leave equipment or dispose of debris on his property.

Staci Kinnard, an environmentalist with the Shelby County Health Department, testified that her job entails investigating, among other things, complaints of illegal dumping. In March 2007, she investigated a complaint of illegal dumping at 1915 and 1925 Beacon Road. Her inspection revealed numerous items at the rear of the properties, including lumber, toilets, garbage, bulldozers, dumpsters, and a bus. Ella Faulkner, the owner of the property at 1915 Beacon Road, informed Ms. Kinnard that she had rented the property to Ricky Whittington and was allowing him to use it for dumping to fill in a ravine on her property. Ms. Faulkner and Mr. Whittington were cited for illegal dumping, and the properties at 1915 and 1925 Beacon Road were cleaned up. A lot of the debris, however, had been pushed into the ravine at the back of the two subject properties, and Mr. Whittington

and the defendant were instructed to clean it up as well.

In June 2008, Ms. Kinnard received another complaint about dumping, this time east of 1915 Beacon Road at 1909 Beacon Road, which was later revealed to be owned by the defendant. An inspection revealed significant "lumber, junk, rubbish, and debris" as well as "equipment, dumpsters, [and] trucks." Ms. Kinnard contacted the telephone number on one of the trucks, which connected her to the defendant's business. Ms. Kinnard left a message with the defendant's secretary, with instructions to clean up the property. Ms. Kinnard met with the defendant on October 1, 2008, at 1909 Beacon Road and discovered that much of the debris and equipment was still present on the property. At that time, Ms. Kinnard served the defendant with a notice of violation, instructing him to appear in court. Three weeks later, the matter was resolved in general sessions court with an order instructing the defendant to cease dumping on the property.

On June 17, 2009, Ms. Kinnard received another complaint about dumping at 1909 Beacon Road. Over the next two months, Ms. Kinnard made several attempts to inspect the property but was unable to do so because a locked cable blocked access to the property. On August 11, 2009, Ms. Kinnard was finally able to access the property, where she again encountered building materials and debris. Ms. Kinnard spoke with the defendant the following day and instructed him to remove the debris from the property. After numerous attempts to reinspect the property, Ms. Kinnard was able to gain access on November 24. At that time, she discovered that the building materials and debris had been pushed to the rear edge of the property, abutting the ravine. Ms. Kinnard was unable to access the property again until April 7, 2010, at which time she encountered "a pile of junk, concrete, and rubbish" on the lot, as well as dumpsters and equipment.

On cross-examination, Ms. Kinnard testified that the ravine at the rear of the Beacon Road properties runs behind 1925, 1915, and 1909 Beacon Road, as well as other lots on that road. Ms. Kinnard admitted that, since at least 2007, she had witnessed debris in the ravine that had never been cleaned out. Ms. Kinnard admitted that Mr. Grifton Jones, whose property was just east of 1909 Beacon Road and which also backed up to the ravine, was cited for having debris and rubbish on his property at one time.

On redirect examination, Ms. Kinnard testified that, in all of her dealings with the defendant, he never complained that others were dumping debris on his property.

Debra Hardaway with the City of Memphis office of Condemnation of Property and Code Enforcement testified that, between 2007 and 2009, the defendant's company, B&W Excavating, was awarded 453 contracts to demolish houses for the City of Memphis, and the defendant submitted invoices totaling $1,013,950.

John Boatright, a civil engineer with the State of Tennessee Department of Environment and Conservation ("TDEC") Division of Solid Waste Management, testified that he is in charge of the Solid Waste Division in the Memphis field office. His job entails inspecting landfills and searching for facilities that are operating without permits. When asked about the process of obtaining a landfill permit, Mr. Boatright explained that, once an applicant locates a parcel of land, the applicant submits an application and pays the accompanying fee. Mr. Boatright's office reviews the application and conducts a geological survey of the land, which can take up to one year to complete. The applicant then submits plans based on the results of the geological survey. Once Mr. Boatright's office has reviewed the plans and determined that they comply with applicable regulations, his office will hold a public hearing to allow the public to comment on the proposed landfill site. The office then decides whether to grant or deny the permit application. Mr. Boatright testified that, to his knowledge, the defendant had never submitted an application for a landfill permit.

In 2008, Mr. Boatright received a complaint about a Beacon Road property. Mr. Boatright photographed the site and observed "construction demolition-type debris" that appeared to have been dumped out of a transport vehicle. Mr. Boatright also observed waste that had been pushed into the ravine at the rear of the property, as well as waste that had been scattered around the property.

George Sykes, president of Waste Solutions, testified that his company, among other things, specializes in hauling waste from commercial and industrial sites. Mr. Sykes testified that the defendant contacted him in July 2009 to inquire whether Mr. Sykes would be interested in purchasing some dumpsters. Mr. Sykes went to Beacon Road to view the dumpsters, and he encountered approximately 10 red dumpsters, all of which were in poor condition. Mr. Sykes also observed construction and demolition debris on the property near the dumpsters. Mr. Sykes then contacted the defendant to inform him that, due to the damage to the dumpsters, he had no interest in purchasing them. Mr. Sykes asked the defendant "how was he able to dump back there at this site," and the defendant replied that "a lot of people dump in un[-]permitted areas and that's an area he used to dump in." Mr. Sykes, appalled by this admission, reported the defendant to Jim Beecher with M&F Construction and Torian Harris with the TDEC.

On cross-examination, Mr. Sykes acknowledged that, on the day he visited the Beacon Road site, nothing prevented him from driving onto the property, and he admitted that anyone could have engaged in dumping on the site at that time. Mr. Sykes testified that the defendant had mentioned "five or six other sites that you can go and dump construction and demolition debris that were not permitted."

Ella Faulkner, age 76, testified that, prior to June 19, 2009, she resided at 1915

Beacon Road. Ms. Faulkner testified that her daughter, Evelyn, owned the house next door at 1925 Beacon Road. Both pieces of property had been in her family for a number of years. Ms. Faulkner's brother-in-law, Raymond, had given Mr. Whittington and the defendant permission to dump construction debris behind her house and her daughter's house. In March 2007, Ms. Faulkner received a citation from the Memphis Health Department due to the dumping on her properties, after which the dumping ceased. The defendant then had all of the dumpsters and machines moved on to his own property at 1909 Beacon Road. Soon after, Ms. Faulkner began seeing the defendant's company trucks bringing construction debris and dumping it on his own property. Ms. Faulkner witnessed the defendant's dump trucks delivering debris to the property on a daily basis, and she witnessed the defendant operating a bulldozer on his property, pushing debris into the ravine. Ms. Faulkner also witnessed the defendant's company trucks hauling dirt away from her property, which she had never given anyone permission to do.

Evelyn Faulkner testified that, prior to June 2009, she resided at 1915 Beacon Road with her mother, Ella Faulkner. Evelyn Faulkner's sister, Brenda, lived at 1925 Beacon Road until 2009, although that property was owned by Evelyn Faulkner. She testified that she noticed holes on her property where trees had been removed, and she stated that she never gave anyone permission to remove dirt from or otherwise damage her property.

Jacqueline Thomas, a relative of the Faulkners, testified that she moved into the residence at 1925 Beacon Road in the summer of 2009. When she moved in, she noticed "a lot of dumping going on." Ms. Thomas witnessed dump trucks arriving empty and leaving filled with dirt, and other times, Ms. Thomas saw the trucks arriving filled with debris and leaving empty. Ms. Thomas saw trucks entering and leaving the 1909 property "[a]t least three, four times a day."

MPD Officer Milton Bonds testified that, on September 5, 2009, he was on patrol in the Boxtown area when he noticed a man dumping a load of tires on the defendant's Beacon Road property. Officer Bonds issued a citation to the man, identified as Murrell Bolton, for illegal dumping. Murrell Bolton explained that he was dumping the tires at the behest of his boss and relative, the defendant. Officer Bonds then contacted the defendant, who confirmed that he had instructed Murrell Bolton to dump the tires on the defendant's property. Officer Bonds testified that he observed much debris and several dumpsters, or "roll-off" containers, on the property as well.

Vickie Burgess, Jason Quinton, Steve Keylor, and Vincent Timberlake, all of whom are employed by local landfill companies, testified that they had no records of the defendant's or his company's ever using their companies to dispose of debris. Susan Weir with North Memphis Landfill testified that, between April 2, 2007 and October 29, 2007, the

defendant's company, B&W Excavating, brought loads of debris to the North Memphis Landfill totaling 15,311 cubic yards. The company stopped doing business with the defendant on November 9, 2007.

Torian Harris, a TDEC environmental criminal investigator, testified that he received a complaint from George Sykes on August 11, 2009, about a man with property on Beacon Road who was using that property to dump demolition debris. Mr. Harris drove to the site the following day, but he was unable to gain access to the property. Mr. Harris returned to 1909 Beacon Road on September 2, 2009, and he saw a white truck with a red roll-off container that was "in the off-loading position," preparing to "drop the container onto the ground." Mr. Harris also encountered construction debris scattered around the property and near the edge of the ravine, and he noticed bulldozer tracks on the site and approximately 20 red dumpsters.

Mr. Harris spoke with the defendant on September 2, and the defendant informed him that he owned the property, as well as the containers and the bulldozer on the property. The defendant denied operating an illegal landfill but admitted that he had instructed Murrell Bolton to dump the load of tires. The defendant also stated that he operated the bulldozer and that he was using it to push debris into the ravine.

Mr. Harris returned to 1909 Beacon Road on October 14, 2009, in response to a complaint from Jacqueline Thomas about dirt being removed from the property. Once at the site, Mr. Harris noticed additional dumping, as well as a significant amount of dirt that had been dug up and removed, creating two "borrow pits" that were "larger than this courtroom." Mr. Harris testified that the borrow pits were not present when he visited the site on September 2.

Douglas Miller, a professional geologist and engineer with Environmental Management and Engineering, testified as an expert in the area of environmental cleanup. Mr. Miller visited the 1909 Beacon Road site three times in May and June, 2011. On his initial visit, he noticed "disturbed soil," where it appeared that "a bunch of trash had been covered by dirt" and "pieces of debris [were] sticking up." Mr. Miller also noticed roll-off containers with materials inside the containers, piles of timber, and a variety of shingles, tiles, and other household debris spread around the site. Mr. Miller testified that debris was blocking a stream channel at the bottom of the ravine and that a large amount of sediment had formed in areas where the channel had been blocked. The pile of debris in the ravine contained garbage, lumber, pipe, shingles, plastic, insulation, roofing materials, carpet, and pieces of appliances, among other things. Mr. Miller also observed two borrow pits, which impacted both Carl Everett Johnson's property and other nearby properties.

Mr. Miller estimated that 24,380 cubic yards of debris had been dumped into the ravine on Mr. Johnson's property and that the cost to properly remove and dispose of that debris would be between $360,000 and $415,000. With respect to the small borrow pit on Mr. Johnson's property and the portion of the large borrow pit that was on his property as well, Mr. Miller estimated that the cost to fill those areas with dirt would be between $7,900 and $15,800. Mr. Miller estimated the cost to fill the portion of the borrow pit that impacted 1915 Beacon Road to be between $5,400 and $10,800, and, with respect to 1925 Beacon Road, he estimated a cost between $3,280 and $6,560.

Jason Simpson, operations manager for Hill Services, an industrial and environmental contractor, testified as an expert in environmental cleanup as well. Mr. Simpson examined 1909 Beacon Road and the surrounding properties in February 2010. He expressed his concerns about the construction and demolition debris as follows:

> Well, the thing you got to remember is when you're tearing down houses in a city like Memphis, most of the houses they are tearing down are properties the city has taken over for whatever reason and they're older houses from the 20s, 30s, 40s, all the way up to [the] 60s.
>
> The main problem was they painted those houses with lead paint; okay? Most of these houses would have contained lead paint and/or some form of asbestos, whether it be tiles, floor tiles, bathroom tiles. A lot of people don't know a lot of floor tiles back then were made out of asbestos, you know. The same thing you hear about now that's so bad. People made floor tiles, roofing shingles, all that stuff was made out of asbestos, so we learned when we dig into these kind of places you typically find that kind of material.
>
> . . . .
>
> Asbestos is a known carcinogen. It creates a lot of specialized cancers that are untreatable. That's the main problem with asbestos. It also has, you know, several other lung problems not cancer related.
>
> But lead paint is also a carcinogen. It affects fresh water streams, it affects fish, wildlife. I mean, that's what it will do.

Mr. Simpson then summarized his recommended course of action for cleaning up the site:

> Well, we would have to mobilize some equipment here. You'd need probably three – well, several pieces of equipment, several dump trucks, eight or ten people. We would also have to have an engineer involved, you know, because they have to put the stamp on it that it is back to the original grade and all that. It would be a large task. There would be a lot involved in this, not to mention the disposal. The disposal would be the problem in this job. . . . Because you can look at the top of this ground and anybody can tell you what's on top of it, but there's absolutely no way to tell you what's six inches below this ground. No way. We can dig into this thing and find who knows what. I mean, who knows what's been put in here. There's no way to tell. So I mean, you base it on what you see and what you think is in there. But like I said, I've done a lot of these and I've never dug into one that didn't have surprises for us. . . . Acetylene tanks, oxygen bottles, old underground tanks, oil, fuel. I mean, lead. You name it. We dug into that. . . . I mean, we actually have found bazooka rounds in these things before. You never know what's in them.

Mr. Simpson estimated that clean-up would take over one month. He testified that he did not believe that a "cap in place" or "closure in place" system, wherein the debris would be covered and sealed, would be feasible, given the amount of maintenance that would be required. Instead, Mr. Simpson opined that all of the debris would have to be removed, followed by grading of the site and hydroseeding or a grass mat ground cover, which would be "fairly expensive."

Mr. Simpson estimated the cost to simply remove all debris and plant grass seed to be between $400,00 and $500,000. In 2010, he estimated the total cost to clean the site, dig up all debris, and transport and dispose of the debris properly to be between 1.56 and 2.75 million dollars. In response to a question about the land value, Mr. Simpson testified as follows:

> Well, there's no way – this land has no value because the amount that you would have to spend to put this back in a sellable – if you wanted to sell this land, you couldn't. There would be no way. No bank, no finance company, no one would give you the money to buy this land.

There's no way because if you're buying land like this you're going to have to have a phase one inspection, which is environmental audit. And any company, environmental company, that's going to do that audit is going to tell you right off the bat there's no way you need to buy this land because if you buy this land you inherit this problem.

So let's say I went and bought this land from whoever owns it, now I've got his million dollar – couple of million dollar problem. There's no way that anybody would give you money to buy this.

The State recalled Torian Harris to address the specific issue of closure in place. Mr. Harris opined that the process of conducting a closure in place at the Beacon Road site would be just as costly as removing the debris in its entirety.

The State also recalled Carl Everett Johnson, who testified that the current assessed value of his property was $48,000.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999), the defendant elected not to testify.

Prior to the jury's deliberation, the trial court instructed the jury, with respect to the vandalism charges, that "value" is either "the fair market value of the property at the time and place of the offense," or, "if the fair market value cannot be ascertained, the cost of replacing the property within a reasonable time after the offense." With respect to Count seven regarding violations of the SWDA, the court instructed the jury as follows:

The Court will now explain to you the law applicable to the charges in the seventh count of the indictment. Any person who commits the offense of violation of the Solid Waste Disposal Act is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: That the defendant operated a solid waste disposal site in violation of the rules and regulations or orders of the commissioner or in such a manner as to create a public nuisance; and two, that the defendant acted knowingly.

Based on this evidence, the jury convicted the defendant of one count of vandalism of property valued at more than $60,000, two counts of vandalism of property valued at $1,000 or more but less than $10,000, one count of theft of property valued $10,000 or more but less than $60,000, two counts of theft of property valued at $1,000 or more but less than $10,000, and two counts of violating the Solid Waste Disposal Act.

Following a sentencing hearing, the trial court sentenced the defendant, a Range I offender, as follows:[1]

| Count | Conviction | Sentence | Alignment |
|---|---|---|---|
| 1 | Vandalism of property valued at $60,000 or more | 9 years to be served as 15 years' probation coupled with 8 months' incarceration | Consecutive to Count 2; Concurrent with Counts 3-8 |
| 2 | Vandalism of property valued at $1,000 or more but less than $10,000 | 3 years' probation | Consecutive to Count 1; Concurrent with Counts 3-8 |
| 3 | Same | 2 years' probation | Concurrent with Counts 1, 2, 4-8 |
| 4 | Theft of property valued at $10,000 or more but less than $60,000 | 3 years' probation | Concurrent with Counts 1-3, 5-8 |
| 5 | Same | 2 years' probation | Concurrent with Counts 1-4, 6-8 |
| 6 | Same | 2 years' probation | Concurrent with Counts 1-5, 7-8 |
| 7 | Violation of SWDA | 6 months | Concurrent with Counts 1-6, 8 |
| 8 | Same | 6 months | Concurrent with Counts 1-7 |

[1]The sentences memorialized in the judgments differ from that actually imposed by the trial court at the sentencing hearing. This chart reflects the sentences as imposed by the trial court at the sentencing hearing.

In addition, the trial court ordered the defendant to pay restitution in the amount of $1.56 million to Mr. Johnson, $3,280 to Evelyn Faulkner, and $5,400 to Ella Faulkner.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the evidence adduced at trial was insufficient to support his vandalism convictions, that the trial court erred by improperly instructing the jury on the value element of vandalism, and that the trial court erred by improperly instructing the jury on the illegal operation of a solid waste disposal site. We consider each claim in turn.

*I. Sufficiency*

The defendant contends that the evidence is insufficient to support his convictions of vandalism because the State failed to present sufficient proof of the value of the damaged properties. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "Vandalism" occurs when a person "knowingly causes damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent." T.C.A. § 39-14-408(a). "'Damage' includes, but is not limited to . . . [d]estroying, polluting or contaminating property; or . . . [t]ampering with property and causing pecuniary loss or substantial inconvenience to the owner." T.C.A. § 39-14-408(b)(1)(A)-(B). "'Polluting' is the contamination by manmade or man-induced alteration of the chemical, physical, biological or radiological integrity of the

-11-

atmosphere, water, or soil to the material injury of the right of another." T.C.A. § 39-14-408(b)(2). Pollutants include, among other things, solid waste, garbage, chemical wastes, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste. *Id.* "Acts of vandalism are to be valued according to the provisions of § 39-11-106(a)(36)." T.C.A. § 39-14-408(c). "Value," as is applicable in this case, is defined as

> (i) The fair market value of the property or service at the time and place of the offense; or
>
> (ii) If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense;

T.C.A. § 39-11-106(a)(36)(A)(i)-(ii).

Here, the proof adduced at trial established that the defendant had, over the course of at least 16 months, dumped massive amounts of construction and demolition debris on the properties of Mr. Johnson, Ms. Ella Faulkner, and Ms. Evelyn Faulkner, without the consent of any of the property owners. The defendant admitted to Mr. Sykes that "a lot of people" dump in unauthorized areas, and the defendant even bragged to Mr. Sykes of his knowledge of "five or six other sites" where unauthorized dumping occurred. When the defendant spoke with Mr. Harris on September 2, 2009, the defendant told Mr. Harris that he operated the bulldozer on his property and was using it to push tires into the ravine. Mr. Miller testified that the cost to properly remove and dispose of the debris in the ravine on Mr. Johnson's property would be between $360,000 and $415,000, and the cost to fill the borrow pits on Mr. Johnson's property would be between $7,900 and $15,800. Mr. Miller opined that the cost to fill the borrow pit on Ms. Ella Faulkner's land would be between $5,400 and $10,800, and the cost to fill the pit on Ms. Evelyn Faulkner's property would be between $3,280 and $6,560. Mr. Simpson testified that Mr. Johnson's property no longer held any value due to the extreme amount of damage caused by the dumping. Mr. Simpson estimated that the total cost to clean the site, extricate all debris, and transport and properly dispose of the debris would be between 1.56 million and 2.75 million dollars. As such, we conclude that the evidence overwhelmingly supports the jury's decision to convict the defendant of one count of vandalism of property valued at $60,000 or more and two counts of vandalism of property valued at $1,000 or more.

The defendant argues that the plain language of the statute requires that replacement costs should only be relied upon when the fair market value of the property cannot be ascertained. *See* T.C.A. § 39-11-106(a)(36)(A)(i)-(ii).

The most basic principle of statutory construction is "'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). "Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.'" *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004) (quoting *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000)). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." *Boarman v. Jaynes*, 109 S.W.3d 286, 291 (Tenn. 2003) (citing *State v. Nelson*, 23 S.W.3d 270, 271 (Tenn. 2000)). "It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources." *In re Estate of Davis*, 308 S.W.3d 832, 837 (Tenn. 2010) (citing *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998)). "Further, the language of a statute cannot be considered in a vacuum, but 'should be construed, if practicable, so that its component parts are consistent and reasonable.'" *In re Estate of Tanner*, 295 S.W.3d 610, 614 (Tenn. 2009) (quoting *Marsh v. Henderson*, 424 S.W.2d 193, 196 (Tenn. 1968)). This court must also "presume that . . . the General Assembly 'did not intend an absurdity.'" *Lee Med., Inc.*, 312 S.W.3d at 527 (quoting *Fletcher v. State*, 951 S.W.2d 378, 382 (Tenn. 1997)).

Although the statute defining value is written in the disjunctive, this court has consistently held that the value of the cost of repairs is an appropriate method of determining the value of damage sustained by vandalized property. *See State v. John Lindsey, III*, No. E2011-00052-CCA-R3-CD, slip op. at 6-7 (Tenn. Crim. App., Knoxville, Nov. 5, 2012), *perm. app. denied* (Tenn. Mar. 21, 2013); *State v. Kenneth Edward Watts*, No. E2010-00553-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, Nov. 8, 2011), *perm. app. denied* (Tenn. Mar. 7, 2012); *State v. Mitchell Eads*, No. E2006-02290-CCA-R3-CD, slip op. at 13-14 (Tenn. Crim. App., Knoxville, June 26, 2008), *perm. app. denied* (Tenn. Jan. 26, 2009); *State v. Jimmy Dewayne Lentz*, No. M2006-01774-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Nashville, Aug. 13, 2007); *State v. Nona Pilgram*, No. E2004-00242-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Knoxville, Mar. 14, 2005); *State v. Terry W. Bean*, No. M2003-02062-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Nashville, Oct. 28, 2004); *State v. Noah Hamilton*, No. E2000-01018-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Knoxville, May 18, 2001), *perm. app. denied* (Tenn. Oct. 1, 2001). We have even approved the use of replacement or repair costs to determine value when the fair market value has not been addressed and could feasibly have been determined. *See John Lindsey, III*, slip op. at 6-7 (holding evidence was sufficient to establish vandalism of property valued at $1,000 or more but less than $10,000 when testimony showed cost to repair damaged door was at least $1,700, without discussion of fair market value); *Kenneth Edward Watts*, slip op. at 2-3

(defendant found guilty of vandalism of property valued at $10,000 or more but less than $60,000 based on proof of repair and replacement costs, without mention of fair market value); *Mitchell Eads*, slip op. at 13-14 (holding evidence was sufficient to establish vandalism of property valued at $1,000 or more but less than $10,000 when testimony showed cost of repairs to burglarized school was approximately $1,000, without discussion of fair market value); *Jimmy Dewayne Lentz*, slip op. at 3-4 (finding evidence sufficient to support conviction of vandalism of property valued at $10,000 or more but less than $60,000 when proof established more than $10,000 in repair and replacement costs due to water damage at jail from broken sprinkler, without discussion of fair market value). In *Noah Hamilton*, the defendant was convicted of vandalism of property valued at $1,000 or more but less than $10,000, as a result of his driving his car through the victim's field and destroying the victim's wheat crop. *Id.* at 2. The defendant argued that the evidence was insufficient to prove vandalism because the State failed to introduce evidence of the reduction in fair market value to the property, as required by statute. *Id.* at 4. This court held as follows:

> The defendant fails to recognize that Tennessee Code Annotated section 39-11-106(a)(36)(A)(ii) further provides that "[i]f the fair market value of the property cannot be ascertained" then the value shall be established by "the cost of replacing the property within a reasonable time after the offense." In this case, the evidence showed that the cost of repairing the property to its status prior to the defendant's actions was $2000. We are cognizant of the fact that one might argue that such action to the property is considered repair and not replacement. However, implicit in most replacement of damaged property, whether real or personal, is the requirement for extra costs that could be considered repairs. Thus, we find no error in the trial court's conclusion that the value of the damage to the victim's property was $2000, sufficient to establish the defendant's actions were a Class D felony.

*Id.*

Because the overriding goal of statutory construction is to "give effect to the legislative intent" without being unduly restrictive, *see Houghton*, 90 S.W.3d at 678 (citation omitted), the use of the cost of repairs to property damaged by vandalism is an appropriate measure of value, particularly when the vandalism itself reduces the fair market value of the property. To do otherwise could provide an incentive to vandals to seek property in low-value areas as dumping grounds, an absurd result. *See Lee Med., Inc.*, 312 S.W.3d at 527.

-14-

We believe the State's argument on this point to be apt:

> It is difficult to imagine that the Tennessee General Assembly intended to incentivize vandals to single out low-value land in low-income areas to use as dumping grounds. Yet that would be the result if Tenn. Code Ann. § 39-11-106(a)(36)(A)(ii) is interpreted as the defendant urges. A vandal could pick a piece of low-value land and transform it – as did the defendant – into a multi-million dollar dump filled with toxic materials. Then, according to the defendant's logic, he would only be criminally liable for the fair market value of the land. This would encourage would-be vandals to seek out the most economically depressed neighborhoods possible, and use them as dumping grounds, secure in the knowledge that their criminal liability is capped at the low value of the land.

Thus, the cost to repair the victims' properties in this case was an appropriate measure of value.

The defendant also contends, as a sub-issue, that the trial court erred by allowing Mr. Johnson to testify as to the value of his property. At trial, Mr. Johnson testified, in response to a question about the value of his property prior to the dumping, that "the assessed value right now for that parcel is about $48,000." Mr. Johnson made no attempt to adopt the property assessor's appraised value of his property as his own opinion of the property's value.

The issue was presented to us on appeal as a component of the defendant's argument that the evidence is insufficient. Accordingly, we essentially view this challenge as a claim that the trial court should not have relied upon Mr. Johnson's use of the $48,000 figure. The figure was placed into evidence, however, and its inclusion into the sufficiency of the evidence calculus is not affected by whether this testimony should have been inadmissible. *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981) (holding that even inadmissible evidence goes into a calculation of the sufficiency of the evidence).

To the extent that the defendant may have miscast the issue and may be challenging the *admission* of the evidence, his claim is waived because it was not presented in the motion for new trial as an evidentiary issue. *See* Tenn. R. App. P. 3(e) (providing that, "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . or other ground upon which a new trial is sought,

-15-

unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived").

Furthermore, we will not treat the claim as one of plain error, *see* Tenn. R. App. P. 13(b), because, even if Mr. Johnson's testimony about value was hearsay evidence, our consideration of the issue is not necessary to assuring substantial justice, *see State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (including within the factors for noticing plain error that "consideration of the error is 'necessary to do substantial justice'") (*quoting State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Mr. Johnson's estimate essentially favored the defendant. Additionally, the jury's verdict reflects that the jury did not rely on Mr. Johnson's testimony as to property value because the jury found the defendant guilty of vandalism of property valued at $60,000 or more rather than $10,000 or more but less than $60,000. Thus, it appears from the record that Mr. Johnson's hearsay testimony did not adversely impact the defendant.

Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence supports the defendant's convictions of vandalism.

## II. Jury Instructions

The defendant next contends that the trial court erred by instructing the jury both as to value and as to the illegal operation of a solid waste disposal site.

### A. Value

The trial court, in its charge to the jury, provided the following instruction on value:

> If you find the defendant guilty of these offenses beyond a reasonable doubt, you must go further and fix the range of value of the property. Value is: One, the fair market value of the property at the time and place of the offense; or two, if the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense.

Although the defendant did object throughout the course of the trial to the admission of repair costs, he made no objection to the inclusion of the above jury instruction. He did, however, include his objection to the instruction in his motion for new trial. "An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised

for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn. 1996) (citing Tenn. R. Crim. P. 30(b))). To the extent the defendant is arguing that the trial court *omitted* a jury instruction, such as the failure to address diminution in value of property, such argument is waived for failure to contemporaneously object. *See Faulkner*, 154 S.W.3d at 58; *Lynn*, 924 S.W.2d at 899. With respect to the defendant's argument that the trial court's jury instruction on value was *erroneous*, we find such argument to be inapt because the jury instruction provided by the court tracks the statutory language on value almost verbatim, *see* T.C.A. § 39-11-106(a)(36)(A)(i)-(ii), and is a correct statement of the law. Accordingly, the trial court did not err by instructing the jury as to value.

## B. *Solid Waste Disposal Act*

With respect to the SWDA, the trial court provided, among others, the following instruction:

> The Court will now explain to you the law applicable to the charges in the seventh count of the indictment. Any person who commits the offense of violation of the Solid Waste Disposal Act is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: That the defendant operated a solid waste disposal site in violation of the rules and regulations or orders of the commissioner or in such a manner as to create a public nuisance; and two, that the defendant acted knowingly.

For the first time in this case, the defendant argues on appeal that this instruction was error because the State failed to present any evidence of violations of "the rules and regulations or orders of the commissioner" and because the jury instructions did not define "public nuisance." At trial, the defendant requested a special jury instruction regarding the SWDA, but he acknowledged that "there's not a lot of difference" between his requested instruction and the trial court's planned instruction, "with one exception." The exception, the defendant explained, was that he wanted the definition of the word "knowingly" to be included with the first SWDA jury instruction, whereas the trial court's planned instruction only included the "knowingly" definition after the second SWDA instruction. The defendant argued that, otherwise, the jurors might not realize that the definition applied to both instructions. The trial court denied the defendant's request, stating, "I think I'm going to go with mine because I feel much more confident with this," to which

the defendant replied, "All right." At no point did the defendant request a definition of "public nuisance" nor did he object to the SWDA jury instructions on any other grounds. Moreover, the defendant did not raise these objections in his motion for new trial or his amended motion for new trial.

"Issues raised for the first time on appeal are considered waived." *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996); *see also* Tenn. R. App. P. 36(b); *State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988). Because he raises this issue for the first time on appeal, it is waived.

### III. Judgment Forms

Although not raised by either party, we detect clerical errors in the judgment forms that require correction.

### A. Count One

The judgment for count one reflects a sentence of nine years for the defendant's class B felony conviction of vandalism of property valued at $60,000 or more, with an eight-month period of incarceration and 15 years' probation. The judgment designates the place of confinement as the Tennessee Department of Correction ("TDOC"). The record clearly establishes that the trial court intended to impose a sentence of split confinement in count one. Code section 40-35-306 provides,

> A defendant receiving probation may be required to serve a portion of the sentence in continuous confinement for up to one (1) year in the local jail or workhouse, with probation for a period of time up to and including the statutory maximum time for the class of the conviction offense.

T.C.A. § 40-35-306(a). Additionally, Code section 40-35-314 states that when the sentence involves "split confinement not to exceed one (1) year, the court shall designate the place of confinement as a local jail or workhouse." *Id.* § 40-35-314(a).[2] These statutes establish that

___

[2]Although Code section 40-35-314 evinces an application of this provision to sentences of "eight (8) years or less," Code section 40-35-306 does not contain the eight-year limitation. Moreover, Code section 40-35-303 provides that defendants receiving sentences of 10 years or less are eligible for probation, *see* T.C.A. § 40-35-303(a) ("A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less . . . ."), and, thus eligible for a sentence of split confinement, *see id.* § 40-35-306(a) (noting that split confinement is available to "[a] defendant receiving
(continued...)

-18-

the place of confinement for the incarcerative portion of a split confinement sentence must be the local jail or workhouse. *Shorts v. Bartholomew*, 278 S.W.3d 268, 275 (Tenn. 2009) (stating that when a defendant received a sentence of split confinement, the appropriate place of confinement was the local jail or workhouse, "erroneously marked TDOC box notwithstanding"). Thus, the trial court's checking the "TDOC" box on the uniform judgment document in this case was erroneous. *Id.* ("Although the standard judgment form . . . provided an option for sentencing an offender to the county jail or workhouse, with a corresponding option of designating a period of incarceration to be served prior to release on probation, the trial court erroneously checked the box next to 'TDOC' in spite of also checking the box next to 'Probation' with a notation 'supervised after serv[ice of] 1 year.'"). Consequently, the judgment in count one must be corrected to reflect that the place of the defendant's eight-month confinement is the local jail or workhouse.

Additionally, the judgment in count one expresses a 15-year term of probation. The transcript indicates, however, that the trial court intended to impose a total term of probation of 15 years and that the trial court intended that counts one and two be served consecutively. When there is a conflict between the transcript and the judgment form, the transcript controls. *See, e.g.*, *State v. Moore*, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991); *State v. Jimmy Lee Cullop, Jr.*, No. E2000-00095-CCA-R3-CD, slip op. at 14-15 (Tenn. Crim. App., Knoxville, Apr. 17, 2001) (remanding for correction of sentence alignment in judgment form to conform to alignment reflected in transcript). In consequence, the judgment in count one cannot reflect a 15-year probation term if it is to carry out the trial court's order vis-a-vis the sentence alignment. To effectuate the trial court's order of consecutive terms and a total effective term of probation of 15 years, the judgment in count one must be amended to reflect a 12-year term of probation.

Finally, the judgment in count one provides that the defendant is to serve his eight-month term of incarceration "at 100%." The law is settled, however that a trial court cannot deny a defendant the statutory right to earn good conduct credits or authorized work credits if the defendant receives a sentence of split confinement and becomes a county jail inmate. *See* T.C. A. § 41-2-111(b). For this reason, the judgment form for count one must be corrected to remove the requirement of day-for-day confinement.

---

[2](...continued)
probation"). We view Code sections 40-35-303 and 40-35-306 as controlling and note that the eight-year provision in Code section 40-35-314 is likely the product of oversight following the 2005 amendment to Code section 40-35-303 raising from eight years to 10 years the length of sentences eligible for probation. *See* 2005 Pub. Acts, ch. 353, § 7.

## B. Count 2

The judgment in count two indicates that it is to be served concurrently with counts one and counts three through eight as well as consecutively to count one. Clearly, the defendant's sentence on count two cannot be served both concurrently with and consecutively to count one. In the sentencing hearing transcript, the trial court states, "I'm going to run counts one and two consecutive." The judgment in count two must be corrected to indicate that the three-year sentence imposed in that count is to be served consecutively to count one and concurrently with the remaining counts.

Additionally, the judgment in count two reflects a sentence of three years for the Class D felony conviction but includes a term of probation of 15 years. Although a trial court may impose a period of probation "up to and including the statutory maximum time for the class of the conviction offense," *see* T.C.A. § 40-35-303(c)(1), the transcript establishes that the trial court intended to impose a total effective term of probation of 15 years and intended that counts one and two be served consecutively. To properly effectuate the trial court's judgment, the judgment in count two must be corrected to reflect a three-year term of probation.

Finally, the judgment in count two, like the judgment in count one, erroneously reflects both a TDOC sentence and an alternative sentence of probation. The judgment must, therefore, be amended to remove the check in the TDOC box.

## C. Remaining Counts

The judgments in counts three through seven indicate that the sentence in each count is to be served consecutively to counts one and two and concurrently with each other. This inaccuracy is apparently due to the parties' misunderstanding of the trial court's total effective sentence. In their briefs to this court, both parties state that the defendant was sentenced to a total effective sentence of 15 years, combining the nine-year sentence in count one, the three-year sentence in count two, and the three-year term comprised of the concurrent sentences in counts three through eight. The trial court, however, made it very clear that the total effective sentence was "12 years. Probation 15 years." Because the transcript controls, we conclude that the trial court extended the defendant's probationary period beyond that of his total effective sentence, which is, as we have indicated, permitted by statute. *See* T.C.A. § 40-35-303(c)(1). Therefore, the judgments in counts three through seven should be corrected to remove the reference to consecutive sentencing with counts one and two and to reflect that the sentences imposed for those counts are to be served concurrently with counts one, two, and eight and with each other. Additionally, the judgment in count eight, although devoid of any erroneous reference to consecutive sentencing,

-20-

indicates that it is to be served concurrently with counts three through seven. This should be corrected to indicate concurrent sentencing with counts *one* through seven.

Like the judgments in counts one and two, the judgments in counts three through eight erroneously reflect a sentence to TDOC as well as a sentence of probation. *See Shorts*, 278 S.W.3d at 275. The checking of the TDOC box was also erroneous in counts seven and eight because those are misdemeanor convictions, the sentences for which must be served in the local jail or workhouse. *See* T.C.A. § 40-35-302(c). These judgments must be amended to remove the erroneous reference to TDOC.

Like the judgment in count two, the judgments in counts three through seven contain an erroneous provision of 15 years' probation. Each of these judgments should be amended to reflect a period of probation equal to the term imposed for that conviction.

*IV. Conclusion*

The evidence is sufficient to support the defendant's convictions of vandalism. The trial court did not err by instructing the jury on value, and the defendant has waived our consideration of the jury instruction on the SWDA. We remand to the trial court for correction of the judgments as outlined in this opinion. In all other respects, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE